984 P.2d 1231

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Jerome ROGAN, also known as Davonte, Defendant–Appellant.**

No. 21908.

Supreme Court of Hawai'i.

Oct. 5, 1999.

Robert T. Nakatsuji, Deputy Public Defender, on the briefs, for defendant-appellant.

James M. Anderson, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

Sandy S. Ma, on the briefs, for Amicus Curiae American Civil Liberties Union of Hawai'i Foundation.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by RAMIL, J.

Defendant-appellant Jerome Rogan appeals from the circuit court's judgment, guilty conviction and sentence, and notice of entry filed on August 26, 1998. A jury found Rogan guilty of four counts of sexual assault in the third degree, in violation of Hawai'i Revised Statutes (HRS) § 707–732(1)(b) (1993).[1] On appeal, Rogan contends that: (1) the circuit court erred in failing to grant his motion for mistrial based on prosecutorial misconduct; and (2) HRS ch. 846E violates various protections afforded by the United States and Hawai'i Constitutions. For the reasons discussed below, we agree with Rogan's first point of error and further hold that reprosecution of Rogan is barred by the double jeopardy clause of article I, section 10 of the Hawai'i Constitution. Accordingly, we reverse Rogan's conviction.

---

1. HRS § 707–732(1)(b) provides in relevant part that "[a] person commits the offense of sexual assault in the third degree if ... [t]he person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person[.]"

## I. BACKGROUND

On May 15, 1997, Rogan was charged with three counts of sexual assault in the first degree (Counts I, II, and IV), in violation of Hawai'i Revised Statutes (HRS) § 707–730(1)(b) (1993),[2] and five counts of sexual assault in the third degree (Counts V to IX).[3]

At trial, the principal witnesses were the Complainant and Rogan. The Complainant, who was twelve years old at the time of the alleged offenses, testified that Rogan had been making telephone calls to her house. Although she had never met Rogan, the Complainant started to talk to Rogan over the phone. During the course of one of their conversations, Rogan asked the Complainant if he could go to her house. After the Complainant agreed, Rogan told the Complainant to call him when her mother left the house, and he gave her his pager number. On September 13, 1995, after the Complainant's mother left the house, the Complainant summoned Rogan to her house by calling Rogan's pager.

The Complainant further testified that when Rogan arrived, she allowed Rogan to enter her home. At that time, the Complainant was wearing a one-piece bathing suit, a tank top, and a pair of shorts. After talking for a while, Rogan and the Complainant went into the Complainant's sister's bedroom to listen to music. According to the Complainant, Rogan told her that he had a belly button ring, but when he took off his shirt, he did not have one.

Thereafter, the Complainant and Rogan turned on some music and started dancing. According to the Complainant, Rogan placed his hand on her buttocks and squeezed as they were dancing. After they finished dancing, Rogan put the Complainant on the bed and touched the Complainant's breast with his hand, body, and mouth. The Complainant also stated that he touched her vaginal area with his hand and tried to put his penis and his finger "into it." The Complainant further stated that he turned her over and started either to lick or insert his finger into her anus. The Complainant explained that Rogan had removed her shorts, but she was still wearing her bathing suit. The Complainant further explained that Rogan moved her bathing suit aside.

The Complainant also testified that Rogan put her hand on his penis. She stated that she told him she was not going to have sex with him and that, at one point, he said "Come on, baby." The Complainant stated that he stopped touching her when her mother entered the room. Immediately thereafter, Rogan put on his clothes and pushed her mother as he ran out the door.

On cross-examination, the Complainant admitted that one of the rules at her house was that she could not have visitors to the house while she was alone. The Complainant stated that, against her parents' wishes and the house rules, she summoned Rogan, told him the address, gave him directions to the house, and let him in. She also stated that someone had been calling her house for two or three months asking for someone named Monica, but her parents hung up on these calls. Two nights before the incident, however, the Complainant received a call from a person asking for Monica and decided to talk to that person. At that time, the Complainant's mother instructed the Complainant to terminate the call, but she did not do so until her mother reached over and hung up the phone for her.

On September 13, 1995, the night of the incident, the Complainant received another phone call from a person asking for Monica

---

2. HRS § 707–730(1)(b) provides in relevant part that "[a] person commits the offense of sexual assault in the first degree if ... [t]he person knowingly subjects to sexual penetration another person who is less than fourteen years old[.]"

3. Count I alleged penile penetration of the Complainant's vagina. Count II alleged anal penetration. The grand jury found "no bill" with regard to Count III, thereby refusing to indict Rogan for this count. Count IV alleged digital penetration of the Complainant's vagina. Count V alleged manual contact with the Complainant's vagina. Count VI alleged that Rogan caused the Complainant to have manual contact with his penis. Count VII alleged manual contact with the Complainant's breast. Count VIII alleged manual contact with her buttock. Count IX alleged oral contact with her breast. All eight counts were also based on the allegation that the Complainant was less than 14 years old. Rogan denied all of these allegations at trial.

and thereafter proceeded to have a full conversation with that person. The Complainant told him that her mother was not going to be home. When Rogan asked to see the Complainant, the Complainant agreed. The Complainant stated that he told her he was in the military, was twenty-one years old, was stationed at Fort Shafter, was from Mississippi, and was black.

The Complainant then stated that she talked to a friend named Shawn on the phone while Rogan was with her and that Rogan even spoke to Shawn. The Complainant also said that her friend Jeanie called while Rogan was there, that Jeanie knew she had a male friend over, and that she did not tell Jeanie she was in any kind of trouble.

The Complainant further admitted that she gave Rogan a "hickey" and that it was not in response to a request for a hickey. The Complainant stated that, throughout the incident, she did not scream for help and that Rogan never threatened to hurt her, her family, or her friends.

The Complainant also testified that her mother was upset by the incident and that her stepfather was very angry. The Complainant admitted that her parents are "kind of strict" and that she knew her parents would be "disappointed" in her and her behavior. The Complainant stated that her parents wanted to see Rogan convicted, but that she did not want to testify. The Complainant also admitted that although she stated she did not want to testify, her parents told her that Rogan's conviction depended on her testimony. The Complainant denied telling Rogan she was seventeen years old or that she was a senior in high school.

Thereafter, Rogan testified on his own behalf. Rogan stated that he was a soldier in the United States Army and that he had arrived in Hawai'i on August 23, 1995—only two or three weeks before the incident on September 13, 1995. At the time of the incident, Rogan was twenty-two years old and was living at Fort Shafter. On the evening of September 13, 1995, Rogan was in a room occupied by a fellow soldier, Ethan Joe. When Joe received a page, Joe asked Rogan to call the number on the pager and to tell the female who answered that he would pick her up later. The female was supposedly named Monica.

When Rogan called the number as a favor to Joe, the female answering the telephone informed him that there was no one named Monica there but asked where he was from and began a casual conversation with him. During the course of the conversation, Rogan told her his age and that he was in the military. The Complainant then told him that she was seventeen years old, was a singer, was going to go to Honolulu Community College, and was going to take a year off to relax. Thereafter, the Complainant told Rogan that her parents would be gone for part of the evening and that it was okay if he wanted to go to her house. The Complainant said she would call him back and let him know the time to come over.

Later that night, the Complainant called Rogan's pager. When Rogan returned the Complainant's page, the Complainant gave him a specific time he could meet her at her house. Rogan stated that he did not find it unusual that the Complainant was going to let him meet her at her house only when her parents were gone. Rogan explained that the parents of the female he previously dated objected because he was African–American.

When Rogan arrived at the Complainant's house, the Complainant invited him in. After talking and watching television for a few minutes, the Complainant suggested that they go into the bedroom. While in the bedroom, Rogan asked the Complainant to dance. While they were dancing, the Complainant started kissing his neck. After Rogan picked her up and placed her on the bed, the Complainant pulled Rogan's shirt over his head. The Complainant continued to kiss Rogan's neck. Rogan then said, "Come on, you want to do it?" The Complainant responded, "No, I'm not having sex with you." Rogan thought the Complainant was not serious because she was laughing and continued to kiss his neck.

Rogan removed the Complainant's shorts, but did not remove the Complainant's bathing suit. Meanwhile, the Complainant continued to kiss Rogan and gave Rogan two or three hickeys on his neck. Because Rogan

thought the Complainant wanted to have sex with him, he pulled his pants down, took out his penis and asked if he could "put it in." In response, the Complainant said, "No, I'm not going to have sex with you," and laughed. Rogan again said, "Come on, let me put it in." The Complainant then shoved Rogan back and said, "Pull your damn pants up, I told you we're not going to have sex," and laughed. Rogan then pulled his pants up, and the Complainant put her shorts back on.

Rogan testified that he did not touch the Complainant in the vaginal area with his hand, did not put his finger in her hymenal orifice, and did not insert a finger into her vagina. Rogan stated that he did not penetrate the Complainant's anus with his finger, penis, or tongue. Rogan also stated that he did not penetrate the Complainant's vagina with his penis or finger. Rogan also testified that the Complainant looked like she was seventeen years old at the time of the incident and that the girl he previously dated, who was twenty years old, looked younger than the Complainant.

Eventually, the Complainant's mother opened the door to the bedroom. Upon doing so, the Complainant's mother was "real shocked" and started "going crazy and [the Complainant] started going crazy, saying, I'm sorry, I'm sorry, I'm sorry." Immediately thereafter, Rogan put his clothes back on and tried to exit. While trying to exit, Rogan bumped the Complainant's mother.

Thereafter, the prosecution and defense delivered closing arguments. During the prosecution's rebuttal argument, the deputy prosecutor stated in relevant part that finding "some black, military guy on top of your daughter" is "every mother's nightmare." Defense counsel objected on the ground that the comment constituted an appeal to racism, but the trial court overruled the defense objection.

After the jury was excused for its deliberations, defense counsel moved for a mistrial based on the prosecution's appeal to racial prejudice. The deputy prosecutor stated that he had not intended to inflame the jury and apologized to Rogan. The circuit court denied the motion.

The jury later found Rogan not guilty as to Count II, guilty as to Counts V and VIII, guilty of lesser included offenses as to Counts I and IV, and could not reach a verdict as to Counts VI, VII, and IX. In sum, Rogan was found guilty of four counts of sexual assault in the third degree.

Rogan was sentenced to five years of probation, fifty days of incarceration with credit for time served, a fee of $400 payable to the Criminal Injuries Compensation Commission, sex offender treatment, and various other terms and conditions of probation. At sentencing, defense counsel objected to the application of the sex offender registration law to Rogan, but the circuit court ruled that Rogan was required to register by statute. Thereafter, Rogan filed a timely notice of appeal.

## II. *STANDARDS OF REVIEW*

### A. *Prosecutorial Misconduct*

 The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion. *State v. Loa*, 83 Hawai'i 335, 349, 926 P.2d 1258, 1272, *reconsideration denied*, 83 Hawai'i 545, 928 P.2d 39 (1996) (citations omitted). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Ganal*, 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (quoting *State v. Furutani*, 76 Hawai'i 172, 178–79, 873 P.2d 51, 57–58 (1994)).

### B. *Constitutional Law—Double Jeopardy*

 The issue whether a reprosecution is barred by double jeopardy is a question of constitutional law. We review questions of constitutional law "by exercising our own independent constitutional judgment based on the facts of the case." *State v. Arceo*, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996) (quoting *State v. Trainor*, 83 Hawai'i 250, 255, 925 P.2d 818, 823 (1996), and *State v. Lee*, 83 Hawai'i 267, 273, 925 P.2d 1091, 1097 (1996)). Accordingly, we review questions of constitutional law *de novo* under the "right/wrong" standard. *Whiting v. State*, 88 Hawai'i 356,

358, 966 P.2d 1082, 1084 (1998) (citing *State v. Quitog*, 85 Hawai'i 128, 139, 938 P.2d 559, 570 (1997), and *State v. Toyomura*, 80 Hawai'i 8, 15, 904 P.2d 893, 900 (1995) (citing *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied*, 79 Hawai'i 341, 902 P.2d 976 (1995))); *see also State v. Mallan*, 86 Hawai'i 440, 443, 950 P.2d 178, 181 (1998) (citation omitted).

## III. *DISCUSSION*

### A. *Prosecutorial Misconduct*

In his first point of error, Rogan asserts that the circuit court erred in failing to grant his motion for mistrial based upon prosecutorial misconduct. Rogan maintains that the following comment made during the prosecution's rebuttal argument constituted prosecutorial misconduct:

> [Deputy prosecutor:] There was one thing [that defense counsel mentioned] about, you know, it was the parents who wanted the conviction and somehow she was coached. Yeah, you can bet the parents wanted a conviction. *This is every mother's nightmare. Leave your daughter for an hour and a half, and you walk back in, and here's some black, military guy on top of your daughter.* That's what she's saying. . . .

> [Defense Counsel]: Objection, your Honor. This is an appeal to racism.

> THE COURT: Overruled.

■ We have previously stated:

Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of "whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *State v. Balisbisana*, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996) (quoting *State v. Holbron*, 80 Hawai'i 27, 32, 904 P.2d 912, 917, *reconsideration denied*, 80 Hawai'i 187, 907 P.2d 773 (1995)) (citations and internal quotation marks omitted); *see also State v. Sanchez*, 82 Hawai'i 517, 528, 923 P.2d 934, 945 (App.), *cert. denied*, 84 Hawai'i 127, 930 P.2d 1015 (1996) (citation omitted). Factors to consider are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. *State v. Samuel*, 74 Haw. 141, 148, 838 P.2d 1374, 1378 (1992) (citation omitted).

*State v. Sawyer*, 88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998). Misconduct of a prosecutor may provide grounds for a new trial if there is a reasonable possibility that the misconduct complained of might have contributed to the conviction. *Balisbisana*, 83 Hawai'i at 114, 924 P.2d at 1220. We now turn to each factor to be considered separately.

### 1. *The Nature of the Alleged Misconduct*

■ In this case, Rogan contends that the deputy prosecutor's statement that it is "every mother's nightmare [to find] . . . some black, military guy on top of your daughter" constituted an impermissible appeal to racial prejudice. We agree.

### a. *The Role of the Prosecution*

■ This court has repeatedly noted that "[t]he prosecution has a duty to seek justice, to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused." *Quitog*, 85 Hawai'i at 136 n. 19, 938 P.2d at 567 n. 19 (quoting *State v. Moriwaki*, 71 Haw. 347, 354, 791 P.2d 392, 396 (1990) (citations and internal quotation marks omitted)); *State v. Pemberton*, 71 Haw. 466, 476, 796 P.2d 80, 85 (1990). The American Bar Association (ABA) Prosecution Function Standard 3–1.2(c) (3d ed.1993) states that "[t]he duty of the prosecutor is to seek justice, not merely to convict."

■ With regard to the prosecution's closing argument, a prosecutor is "permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence." *Quitog*, 85 Hawai'i at 145, 938 P.2d at 576 (quoting *State v. Clark*, 83 Hawai'i 289, 304, 926 P.2d 194,

209, *reconsideration denied,* 83 Hawai'i 545, 928 P.2d 39 (1996) (citations omitted)). In other words, closing argument affords the prosecution (as well as the defense) the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom. *Quitog,* 85 Hawai'i at 145, 938 P.2d at 576. In this regard, ABA Prosecution Function Standard 3–5.8(a) (1993) states:

> "In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw." The commentary on Standard 3–5.8 aptly emphasizes:

> The prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct. Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office.

b. *Appeals to Racial Prejudice During Closing Argument*

Given these principles, we now focus on appeals to racial prejudice during closing argument. ABA Prosecution Function Standard 3–5.8(c) (3d ed.1993) states in relevant part that prosecutors "should not use arguments calculated to inflame the passions or prejudices of the jury." The 1979 commentary to that section states:

> *Arguments that rely on racial, religious, ethnic, political, economic, or other prejudices of the jurors introduce into the trial elements of irrelevance and irrationality that cannot be tolerated.* Of course, the mere mention of the status of the accused as shown by the record may not be improper if it has a legitimate bearing on some issue in the case, such as identifica-

tion by race. But where the jury's predisposition against some particular segment of society is exploited to stigmatize the accused or the accused witnesses, such argument clearly trespasses the bounds of reasonable inference of fair comment on the evidence. Accordingly, many courts have denounced such appeals to prejudice as inconsistent with the requirement that the defendant be judged solely on the evidence.

(Emphasis added.)

Similarly, courts throughout the country have consistently condemned appeals to racial prejudice during closing argument. *See, e.g., United States v. Cannon,* 88 F.3d 1495, 1503 (8th Cir.1996) (reversing conviction where prosecutor twice called African–American defendants "bad people" and drew attention to the fact they were not from the locality); *Withers v. United States,* 602 F.2d 124, 124–25 (6th Cir.1979) (holding improper prosecutor's statement that "[n]ot one white witness has been produced in this case that contradicts [the victim's] position in this case" where black defendant charged with interstate kidnapping); *Kelly v. Stone,* 514 F.2d 18, 19 (9th Cir.1975) (reversing rape conviction of black defendant because during closing argument the prosecutor told the jury to "[t]hink about the consequences of letting a guilty man ... go free ... [b]ecause maybe the next time it won't be a little black girl from the other side of the track"); *Miller v. North Carolina,* 583 F.2d 701, 708 (4th Cir.1978) (finding error in the prosecution's "blatant appeal to racial prejudice in the assertion that no white woman would consent to sexual intercourse with a black man"); *Brooks v. Kemp,* 762 F.2d 1383, 1413 (11th Cir.1985) *(en banc ), cert. denied,* 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986). The United States Supreme Court has stated that the United States Constitution prohibits racially biased prosecutorial arguments. *McCleskey v. Kemp,* 481 U.S. 279, 309 n. 30, 107 S.Ct. 1756, 95 L.Ed.2d 262, *reh'g denied,* 482 U.S. 920, 107 S.Ct. 3199, 96 L.Ed.2d 686 (1987) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). As the United States Court of Appeals for the District of Columbia observed:

Federal courts have long condemned racially inflammatory remarks during governmental summation.... Racial fairness of the trial is an indispensable ingredient of due process and racial equality a hallmark of justice. Appeals to racial passion can distort the search for the truth and drastically affect a juror's impartiality.

We speak of course, only of racial comments beyond the pale of legally acceptable modes of proof. An unembellished reference to evidence of race simply as a factor bolstering an eyewitness identification of a culprit, for example, poses no threat to purity of the trial. The line of demarcation is crossed, however, when the argument shifts its emphasis from evidence to emotion.

*United States v. Doe,* 903 F.2d 16, 24–25 (D.C.Cir.1990); *see also United States ex rel. Haynes v. McKendrick,* 481 F.2d 152, 157 (2d Cir.1973) ("Racial prejudice can violently affect a juror's impartiality and must be removed from the courtroom proceeding to the fullest extent possible."); *United States v. Hernandez,* 865 F.2d 925, 928 (7th Cir.1989) (noting that race-conscious arguments draw the jury's attention to a characteristic the federal constitution generally demands the that jury ignore).

c. *The Alleged Impermissible Appeal to Racial Prejudice*

In this case, the deputy prosecutor's reference to Rogan as a "black, military guy" was clearly inflammatory inasmuch as it raised the issue of and cast attention to Rogan's race. Because there was no dispute as to the identity of the perpetrator in this case, Rogan's race was not a legitimate area of inquiry inasmuch as race was irrelevant to the determination of whether Rogan committed the acts charged. The prosecution concedes that the deputy prosecutor's comment was "ill-advised." Indeed, the deputy prosecutor's comment had the potential of distracting the jury from considering only the evidence presented at trial. It is therefore inescapable that the deputy prosecutor's reference to Rogan as a "black, military guy" was an improper emotional appeal that could foreseeably have inflamed the jury.

The deputy prosecutor's inflammatory reference to Rogan's race was further compounded by the statement that the incident was "every mother's nightmare," which was a blatantly improper plea to evoke sympathy for the Complainant's mother and represented an implied invitation to the jury to put themselves in her position. Like the deputy prosecutor's reference to Rogan's race, the "every mother's nightmare" comment was not relevant for purposes of considering whether Rogan committed the acts charged.

In response, the prosecution argues that the deputy prosecutor's comments were in rebuttal to defense counsel's closing argument that it was the Complainant's parents alone who wanted Rogan convicted. We disagree. As Rogan argues, the deputy prosecutor's comments do not rebut defense counsel's argument that it was the Complainant's parents alone who wanted Rogan convicted. Instead, the deputy prosecutor's comment that finding "some black, military guy on top of your daughter" is "every mother's nightmare" *supports* the theory that it was the Complainant's parents alone who wanted Rogan convicted. Indeed, the deputy prosecutor said, "Yeah, you can bet the parents wanted a conviction." Under these circumstances, we cannot excuse the deputy prosecutor's reference to Rogan as "some black, military guy" on the basis that the comment was made to rebut the defense counsel's theory that it was the Complainant's parents alone who wanted Rogan convicted.

In light of the foregoing, we note that arguments by the prosecution contrived to stimulate racial prejudice represent a brazen attempt to subvert a criminal defendant's right to trial by an impartial jury as guaranteed by both the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution. Such arguments foster jury bias through racial stereotypes and group predilections, thereby promoting an atmosphere that is inimical to the consideration of the evidence adduced at trial. Moreover, such an appeal to racial prejudice threatens our multicultural society and constitutional values. We must therefore recognize that "[o]ur government is the potent, the omnipresent teacher. For good

or for ill, it teaches the whole people by its example." *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). Accordingly, appeals to racial prejudice lack the professionalism and decorum required of attorneys who practice before the bar of the courts of Hawai'i and will not be tolerated. For this reason, we further hold that references to race that do not have an objectively legitimate purpose constitute a particularly egregious form of prosecutorial misconduct.

### 2. The Promptness of a Curative Instruction

■■■■ With regard to the second factor in determining prosecutorial misconduct, we have previously stated that "a prosecutor's improper remarks are [generally] considered cured by the court's instructions to the jury, because it is presumed that the jury abided by the court's admonition to disregard the statement." *State v. McGriff,* 76 Hawai'i 148, 160, 871 P.2d 782, 794 (1994) (quoting *Pemberton,* 71 Haw. at 475, 796 P.2d at 87 (internal quotation marks omitted)). In this case, however, no curative instruction was given after the inflammatory comments were made. Indeed, not only was there no curative instruction given to address the inflammatory comments, but the circuit court overruled defense counsel's timely objection. Although the circuit court instructed the jury prior to its deliberations that "[s]tatements or remarks made by counsel are not evidence" and that "[y]ou must not be influenced ... by passion or prejudice against the defendant[,]" it is unlikely that the circuit court's general instructions that were delivered well after the inflammatory comments along with the other general jury instructions could have negated the prejudicial effect of the deputy prosecutor's comments. *See State v. Marsh,* 68 Haw. 659, 661, 728 P.2d 1301, 1303 (1986) (vacating conviction and noting circuit court's failure to issue specific instruction concerning prosecutor's closing comments). Therefore, the second factor—the promptness of a curative instruction—weighs heavily in favor of Rogan

inasmuch as no curative instruction was given.

### 3. The Strength/Weakness of the Evidence

With regard to the third factor in determining prosecutorial misconduct, this case essentially turned on the credibility of two witnesses—the Complainant and Rogan. There were no independent eyewitnesses or conclusive forensic evidence in this case. Instead, the prosecution's case against Rogan depended heavily on the Complainant's testimony. Given that Rogan denied having committed any of the acts for which he was charged,[4] this case was based on the Complainant's version of the events against Rogan's version. Under these circumstances, we cannot say that the evidence of criminal conduct against Rogan was overwhelming.

In contrast to the instant case, the evidence against the defendant in *Ganal* was overwhelming. In *Ganal,* we held that despite Ganal's challenge to fourteen portions of the prosecution's closing argument, the prosecution's remarks did not constitute error in light of the overwhelming "strength of the case against Ganal[.]" 81 Hawai'i at 377, 917 P.2d at 389. Specifically, we considered the number of witnesses who had been present during the events in question and who testified against Ganal. *Id.* at 362–65, 917 P.2d at 374–77. In addition, there was abundant forensic evidence, including ballistics, supporting the prosecution. *Id.* at 363–65, 917 P.2d at 375–77. Therefore, considering the circumstances in *Ganal* in comparison to the instant case, it can hardly be said that the case against Rogan, which hinged on the credibility of the Complainant, was so overwhelming as to outweigh the inflammatory effect of the deputy prosecutor's comments.

Given that all three factors discussed above weigh heavily against the prosecution in this case, we cannot conclude that the prosecution's remark that finding "some black, military guy on top of your daughter" is "every mother's nightmare" was harmless

---

4. *See supra* note 3 for the specific allegations in the complaint. As noted, Rogan denied all of the allegations in the complaint at trial.

beyond a reasonable doubt. Because there is a reasonable possibility that the deputy prosecutor's comment during closing argument might have contributed to Rogan's conviction, we hold that the deputy prosecutor's comment constituted prosecutorial misconduct that denied Rogan his right to a fair trial.

### B. Double Jeopardy

In light of our holding with regard to prosecutorial misconduct, the question remains whether the double jeopardy clause of the Hawai'i Constitution bars a retrial of Rogan. We therefore consider the issue whether a retrial is barred by the double jeopardy clause of the Hawai'i Constitution after a finding of prosecutorial misconduct denying a defendant's right to a fair trial.[5] In doing so, we take this opportunity to review the extent to which the double jeopardy clauses of the United States and Hawai'i Constitutions impose limitations on the discretionary exercise of prosecutorial power.

#### 1. Interests Underlying the Double Jeopardy Clause

The double jeopardy clause of the fifth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" Similarly, article I, section 10 of the Hawai'i Constitution provides in relevant part that "nor shall any person be subject for the same offense to be twice put in jeopardy[.]"

■ Based upon these provisions, we have long recognized "that there are three separate and distinct aspects to the protections offered by the double jeopardy clause. 'Double jeopardy protects individuals against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.' " Whiting, 88 Hawai'i at 359, 966 P.2d at 1085 (quoting Quitog, 85 Hawai'i at 141, 938 P.2d at 572 (quoting Higa, 79 Hawai'i at 5, 897 P.2d at 932, and citing State v. Lessary, 75 Haw. 446, 454, 865 P.2d 150, 154 (1994), and United States v. Halper, 490 U.S. 435, 440, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989))). These protections seek to balance two primary and sometimes countervailing interests underlying double jeopardy—defendants' interests and societal interests.

#### a. The Interests of Criminal Defendants

■ Traditionally, the double jeopardy clause has been viewed as safeguarding three interests of defendants: (1) the interest in being free from successive prosecutions; (2) the interest in the finality of judgments; and (3) the interest in having the trial completed in front of the first tribunal. See Rick A. Bierschbach, Note, One Bite at the Apple: Reversals of Convictions Tainted by Prosecutorial Misconduct and the Ban of Double Jeopardy, 94 Mich. L.Rev. 1346, 1348–49 (1996). With regard to a defendant's interest in restricting the prosecution to a single attempt to prove his or her guilt at trial, the United States Supreme Court has offered two fundamental bases. First, multiple prosecutions seriously disrupt a defendant's personal life during trial and create a potential for governmental harassment of the defendant. See Arizona v. Washington, 434 U.S. 497, 503–04, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) (noting that a second prosecution increases the financial and emotional burden on the accused and prolongs the period in which he or she is stigmatized by an unresolved accusation of wrongdoing). Second, repeated prosecutions enhance the likelihood that an innocent defendant may be convicted. See id.; see also United States v. DiFrancesco, 449 U.S. 117, 128, 101 S.Ct. 426, 66

---

5. We have previously touched upon the issue whether a retrial is barred by the double jeopardy principles after a finding of prosecutorial misconduct in the context of a request for mistrial. See State v. Ake, 88 Hawai'i 389, 393 n. 8, 967 P.2d 221, 225 n. 8 (1998) ("Double jeopardy principles ... bar retrial if a mistrial request is provoked by prosecutorial misconduct.)" (Citing, inter alia, Quitog, 85 Hawai'i at 141 n. 22, 142, 938 P.2d at 572 n. 22, 573; State v. Tuipuapua, 83 Hawai'i 141, 148, 925 P.2d 311, 318 (1996)). However, we take this opportunity to fully discuss this issue in the context of a reversal of a conviction on appeal as a result of prosecutorial misconduct and to refine and clarify the standard governing this issue.

L.Ed.2d 328 (1980) (noting that reprosecution allows the government to gain advantage from what it learns at the first trial about the strengths of the defense and its own weaknesses); *Lessary,* 75 Haw. at 455–56, 865 P.2d at 155 (quoting *Grady v. Corbin,* 495 U.S. 508, 518–19, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990)).

Similarly, the interest in the finality of judgments contemplates "the importance to the defendant of being able, once and for all, to conclude his confrontation with society." *United States v. Jorn,* 400 U.S. 470, 486, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *see also Quitog,* 85 Hawai'i at 148–49, 938 P.2d at 579–80 (noting the "constitutional policy of finality for the defendant's benefit" (quoting *United States v. Cavanaugh,* 948 F.2d 405, 413–17 (8th Cir.1991))). Related to but separate from this interest is the defendant's interest in having the trial completed by the first tribunal. *See Crist v. Bretz,* 437 U.S. 28, 36, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) (recognizing right to have trial completed by a particular tribunal). In doing so, the defendant is afforded the protection against manipulation designed to prevent the initial fact-finder from reaching a verdict in the defendant's case. Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 25.1(b) (2d ed.1992).

b. *The Interests of Society*

■ Balanced against the defendant's interests is society's need for effective enforcement of its criminal laws. *See, e.g., Lockhart v. Nelson,* 488 U.S. 33, 38, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) (noting that a defendant's interest in a fair trial must be balanced against society's interest in "punishing one whose guilt is clear" (quoting *United States v. Tateo,* 377 U.S. 463, 466, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964))). To that end, the Court has recognized that society must be afforded the right to one full and fair opportunity to prove a defendant's guilt. *See, e.g., Washington,* 434 U.S. at 505, 98 S.Ct. 824. When trial error deprives society of its right to attempt to prove the defendant's guilt in a single prosecution, the interests of society in vindicating its laws generally outweigh the double jeopardy interests of a defendant.

*See, e.g., Oregon v. Kennedy,* 456 U.S. 667, 685, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *see also, e.g., State v. Lincoln,* 72 Haw. 480, 490–91, 825 P.2d 64, 70 (1992) (noting the necessity for trial court to recognize and weigh the State's interest in prosecuting crime against fundamental fairness to the defendant) (citing *State v. Moriwake,* 65 Haw. 47, 647 P.2d 705 (1982), and *State v. Alvey,* 67 Haw. 49, 678 P.2d 5 (1984)).

c. *The Double Jeopardy Clause As a Limit on Prosecutorial Power*

Having set forth the competing interests underlying double jeopardy, we now consider the effect of the double jeopardy clause on prosecutorial power. We have repeatedly recognized the following purpose of the double jeopardy clause:

> the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him [or her] to embarrassment, expense and ordeal and compelling him [or her] to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he [or she] may be found guilty.

*Whiting,* 88 Hawai'i at 359, 966 P.2d at 1085 (quoting *Quitog,* 85 Hawai'i at 140, 938 P.2d at 571) (quoting *Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957)) (brackets added). In doing so, we have implicitly acknowledged the enormous imbalance of power between the prosecution and the criminal defendant.

■ Indeed, the prosecution wields great discretion

> in the decision to charge and what to charge; in the control of vast governmental resources in investigating and preparing a case; in the plea bargaining process for the majority of cases that are resolved without trial; and in the deference and authority the prosecution commands before juries in those cases that are tried to a conclusion.

Kenneth Rosenthal, *Prosecutor Misconduct, Convictions, and Double Jeopardy: Case Studies in an Emerging Jurisprudence,* 71

Temp. L.Rev. 887 (1998) (footnote omitted).[6] The double jeopardy clause addresses this reality by imposing a potential constitutional bar to reprosecution where there is egregious misconduct on the part of the prosecution. In this connection, we have held "that retrial is barred where 'the defendant's mistrial motion is the necessary response to ... prosecutorial misconduct designed to avoid an acquittal, or is necessitated by deliberate misconduct which has for its intended purpose the denial of the defendant's constitutional right to a fair trial[.]' " *State v. Baranco*, 77 Hawai'i 351, 355, 884 P.2d 729, 733 (1994) (quoting *State v. Pulawa*, 58 Haw. 377, 382, 569 P.2d 900, 905 (1977), *cert. denied*, 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768 (1978)) (brackets in original).

The juxtaposition of the prosecution's great discretion and the substantial interests of the defendant, who bears the brunt of the prosecution's exercise of its power, gives rise to the special standards of conduct discussed fully in Section III.A.1. above. As discussed, the prosecution's primary duty is not merely to seek a conviction. *See Donnelly*, 416 U.S. at 648–49, 94 S.Ct. 1868 (Douglas, J., dissenting) (noting that the prosecution's function is not to "tack as many skins of victims as possible to the wall"). Rather, as stated, the prosecution's primary duty is to "seek justice, to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused." *Quitog*, 85 Hawai'i at 136 n. 19, 938 P.2d at 567 n. 19 (citations omitted). To this end, the prosecution must serve the truth-seeking and fairness functions of trial and to pursue and present relevant evidence, re-gardless of which side it benefits. Therefore, unlike any other advocate, the prosecutor must always be mindful of his or her primary obligation to seek justice while at the same time fulfilling his or her obligation to seek convictions.

2. *The Current Double Jeopardy Balance: The Double Jeopardy Bar After a Mistrial or Reversal of a Conviction as a Result of Prosecutorial Misconduct*

Given the tension between the competing interests of the defendant and society with regard to the double jeopardy clause, we now review various approaches that have attempted to effectuate a workable limitation on prosecutorial discretion.

a. *The United States Supreme Court— The Specific Intent Test*

In *Kennedy*, the United States Supreme Court held that the double jeopardy clause of the fifth amendment to the United States Constitution does not bar a subsequent reprosecution unless the prosecution acted with the specific intent to cause the defendant to move for a mistrial. 456 U.S. at 676, 102 S.Ct. 2083. Kennedy was charged with the theft of an oriental rug. *Id.* at 669, 102 S.Ct. 2083. At trial, the prosecution called an expert witness on the subject of Middle Eastern rugs to testify regarding the value and identity of the rug in question. *Id.* On redirect examination, the prosecution sought to elicit the reasons for the witness' complaint against Kennedy. *Id.* After the trial court

---

**6.** Some of the extensive privileges and resources available to the prosecution include:

exclusive possession of the case file, including all information from the investigative stage during which the government has sole control of the crime scene; immediate, ex parte access to police reports and statements of witnesses, little to none of which can be even belatedly accessed by the defense through pretrial interrogatories or depositions as in civil cases; assistance of local, state, and federal law enforcement personnel and other government agencies; forensic facilities and expertise; grand jury investigation and subpoena power; the right to offer witnesses immunity and monetary rewards contingent upon cooperation—actions that would constitute ethical violations

and criminal offenses if utilized by defense attorneys; additional leverage through control (in concert with a nationwide network of collaborating prosecutors and law enforcement personnel) over the charging and plea bargaining stages that affect the fates of thousands of individuals caught up in the criminal justice system. Additionally, and arguably most important of all, in cases that go to trial, the prosecutor commands special respect (unavailable to any other lawyer) by virtue of the office he holds and the "client" he represents; he speaks with, and as, an authority; he exerts great influence on the jurors (and trial judges) and hence on the ultimate outcome.

Rosenthal, *supra* at 896–97 (footnotes omitted).

sustained a series of objections to this line of questioning, the following colloquy ensued:

Prosecutor: Have you ever done business with the Kennedys?

Witness: No, I have not.

Prosecutor: *Is that because he is a crook?*

*Id.* (emphasis added). The trial court then granted Kennedy's motion for a mistrial, but found that it was not the intention of the prosecution to cause a mistrial. *Id.* (citation omitted).

On appeal, the Oregon Court of Appeals applied the rule that "retrial is barred where the error that prompted the mistrial is intended to provoke a mistrial or is 'motivated by bad faith or undertaken to harass or prejudice' the defendant." *Id.* at 670, 102 S.Ct. 2083 (citation omitted). According to the Oregon Court of Appeals, the prosecution's conduct constituted "overreaching," and Kennedy's conviction was reversed. *Id.*

On certiorari to the United States Supreme Court, a plurality of the Court chose not to concentrate on the egregiousness of the prosecution's overall conduct at trial, focusing instead on the prosecutor's subjective intent. *Id.* at 675–76, 102 S.Ct. 2083. The *Kennedy* Court reasoned that this specific intent standard was preferable in situations involving prosecutorial misconduct because a more general test would bar more retrials after findings of prosecutorial misconduct and could have a chilling effect on the prosecution. *See id.* at 674–75, 102 S.Ct. 2083. The *Kennedy* Court further noted that the specific intent standard, which was narrower than the standard applied by the Oregon Court of Appeals, was more "manageable" because it "merely call[ed] for the [trial] court to make a finding of fact" as to the prosecutor's intent. *Id.* at 675, 102 S.Ct. 2083. Consequently, the *Kennedy* Court limited the application of the double jeopardy bar to situations where the prosecutor intended to "goad" the defendant into requesting a mistrial and where the primary motivation for such goading was to obtain a second

chance to obtain a "more favorable opportunity to convict" on retrial. *See id.* at 675–76, 102 S.Ct. 2083. In other words, regardless how egregious, a prosecutor's misconduct does not bar reprosecution "absent intent ... to subvert the protections afforded by the Double Jeopardy Clause." *Id.*

In a concurring opinion authored by Justice Stevens, four justices disagreed with the plurality,[7] contending that the specific intent test would make it nearly impossible for a defendant to prove that the prosecutor intended by deliberate misconduct to provoke a mistrial and not merely to prejudice the defendant. *Id.* at 688, 102 S.Ct. 2083 (Stevens, Brennan, Marshall, and Blackmun, JJ., concurring). According to Justice Stevens's concurring opinion,

[t]here are other situations in which the defendant's double jeopardy interests outweigh society's interest in obtaining a judgment on the merits even though the defendant has moved for a mistrial. For example, a prosecutor may be interested in putting the defendant through the embarrassment, expense, and ordeal of criminal proceedings even if he cannot obtain a conviction. In such a case, with the purpose of harassing the defendant the prosecutor may commit repeated prejudicial errors and be indifferent between a mistrial or mistrials and an unsustainable conviction or convictions. Another example is when the prosecutor seeks to inject enough unfair prejudice into the trial to ensure a conviction but not so much as to cause a reversal of that conviction. This kind of overreaching would not be covered by the Court's standard because, by hypothesis, the prosecutor's intent is to obtain a conviction, not to provoke a mistrial. Yet the defendant's choice—to continue the tainted proceeding or to abort it and begin anew—can be just as "hollow" in this situation as when the prosecutor intends to provoke a mistrial.

To invoke the exception for overreaching, a court need not divine the exact

7. The plurality opinion, authored by Justice Rehnquist, was joined by three other justices. Justice Powell filed his own concurring opinion, but acknowledged that "the *intention* of a prosecutor determines whether his conduct, viewed by

the defendant and the court as justifying a mistrial, bars a retrial of the defendant under the Double Jeopardy Clause." *Kennedy*, 456 U.S. at 679, 102 S.Ct. 2083 (Powell, J., concurring) (emphasis in original).

motivation for the prosecutorial error. *It is sufficient that the court is persuaded that egregious prosecutorial misconduct has rendered unmeaningful the defendant's choice to continue or to abort the proceeding.*

*Id.* at 689, 102 S.Ct. 2083 (emphasis added).

### b. *Extension of the Double Jeopardy Clause Protection*

Recognizing the inadequacy of the specific intent test set forth in *Kennedy* in ensuring double jeopardy protection against retrial as a result of prosecutorial misconduct, a growing number of jurisdictions have rejected the *Kennedy* standard and have shifted the focus of inquiry away from the prosecution's specific intent. Following the reasoning of Justice Stevens's concurring opinion, these courts have recognized that overreaching by the prosecution can sometimes justify a double jeopardy bar to a subsequent reprosecution even without the prosecutor's specific intent to cause a mistrial with the purpose of obtaining a more favorable opportunity to secure a conviction. *See, e.g., State v. Kennedy*, 295 Or. 260, 666 P.2d 1316 (1983) (holding under the Oregon Constitution, on remand from the United States Supreme Court, that retrial is barred when official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal); *State v. White*, 85 N.C.App. 81, 354 S.E.2d 324, 329 (1987) (noting that "the better reasoned arguments support the broader test that includes bad faith prosecutorial overreaching or harassment aimed at prejudicing the defendant's chances for acquittal"), *aff'd*, 322 N.C. 506, 369 S.E.2d 813 (1988); *People v. Dawson*, 154 Mich.App. 260, 397 N.W.2d 277, 282 (1986) (noting "substantial difficulties with the United States Supreme Court's [specific intent] ... standard"), *aff'd*, 431 Mich. 234, 427 N.W.2d 886 (1988); *United States v. Wallach*, 979 F.2d 912, 916 (2d Cir.1992), *cert. denied*, 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993) (acknowledging in dictum that the double jeopardy clause may protect "a defendant from retrial ... where prosecutorial misconduct is under-taken with the intention of denying the defendant an opportunity to win an acquittal").

For example, in *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992), the Pennsylvania Supreme Court recognized that, although there may be no intent to provoke a mistrial, the misconduct of the prosecutor may be so prejudicial that double jeopardy must attach. *Id.* at 325. In *Smith*, it was revealed that the prosecution had withheld potentially exculpatory physical evidence and had knowingly and falsely denied that its chief witness had been given a favorable sentencing agreement in exchange for testifying. *Id.* at 322–24. In addition, the prosecution intentionally suppressed the exculpatory evidence while arguing in favor of the death sentence and attempted to discredit a law enforcement officer who had testified to the existence of that evidence. *Id.*

On appeal, the *Smith* court characterized the prosecution's behavior as an effort "to subvert the truth-determining process[,]" but found that there was no intent to goad the defendant into moving for a mistrial. *Id.* at 322 (citation omitted). In fact, the prosecution's intention was to *prevent* the defendant from moving for a mistrial by concealing how he had been wrongfully convicted. The *Smith* court reasoned that the specific intent standard would not bar a new trial even where there was a deliberate effort to prejudice a defendant's right to a fair trial. Therefore, the court held, under the Pennsylvania Constitution, that a retrial is barred

not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also *when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.*

*Id.* at 325 (emphasis added).

Similarly, the Arizona Supreme Court adopted a more encompassing standard for the double jeopardy clause of its state constitution than the federal *Kennedy* standard where the prosecution in *Pool* posed numerous improper questions resulting in at least two bench conferences and one court admonishment. *Pool v. Superior Court*, 139 Ariz. 98, 677 P.2d 261, 269, 271–72 (1984). Noting

the difficulty in determining a prosecutor's specific intent, the *Pool* court held, under the Arizona Constitution, that double jeopardy principles bar retrial after a mistrial is declared under the following conditions:

1. Mistrial is granted because of improper conduct or actions by the prosecutor; and

2. such conduct is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal; and

3. the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial.

*Id.* at 271–72 (footnote omitted). In doing so, the court abandoned the subjective intent standard and adopted an objective standard, noting that

[t]he trial judge is to measure what the prosecutor "intends" and "knows" *by objective factors,* which include the situation in which the prosecutor found himself, the evidence of actual knowledge and intent and any other factors which may give rise to an appropriate inference or conclusion. He [or she] may also consider the prosecutor's own explanations of his [or her] "knowledge" and "intent" to the extent that such explanation can be given credence in light of the minimum requirements expected of all lawyers.

*Id.* at 271 n. 9 (emphasis and brackets added). Applying this standard, the *Pool* court concluded that reprosecution was barred. *Id.* at 272.

Adopting a similar objective standard, the Texas Court of Criminal Appeals likewise rejected the *Kennedy* "subjective intent" standard. *Bauder v. State,* 921 S.W.2d 696, 696–700 (Tex.Crim.App.1996) (*en banc*) (hereafter *Bauder II* ), *rev'g,* 880 S.W.2d 502 (Tex.App.1994) (hereafter *Bauder I* ). The defendant in *Bauder* was charged with the offense of driving while intoxicated. *Bauder II,* 921 S.W.2d at 697. Before trial, the court granted defendant's motion in limine barring evidence of any uncharged misconduct by the defendant that had occurred before the charged offense. *Bauder I,* 880 S.W.2d at 503. After the jury was impaneled, the prosecutor presented the arresting officer's testimony that when the defendant had exited the car, he was barely able to stand and his pants were unbuttoned. Thereafter, the prosecutor asked what the defendant had been doing in the parked car before the alleged crime. The officer responded in graphic language that the defendant was receiving oral sex. On this basis, the trial court granted the defendant's motion for a mistrial. *Id.* On appeal, the Texas Court of Criminal Appeals held, under the Texas Constitution, that

a successive prosecution is jeopardy barred after declaration of a mistrial at the defendant's request, not only when the objectionable conduct of the prosecutor was intended to induce a motion for mistrial, *but also when the prosecutor was aware but consciously disregarded the risk that an objectionable event for which he was responsible would require a mistrial at the defendant's request.*

*Bauder II,* 921 S.W.2d at 699.

The New Mexico Supreme Court adopted a similar conscious disregard standard in *State v. Breit,* 122 N.M. 655, 930 P.2d 792 (1996). Like the conscious disregard standard set forth by the Texas Court of Criminal Appeals, the *Breit* court held that retrial is barred

when improper conduct is so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial or a motion for a new trial, and if the official knows that the conduct is improper and prejudicial, and if the official either intends to provoke a mistrial or *acts in willful disregard of the resulting mistrial, retrial, or reversal.*

*Id.* at 803 (emphasis added). The *Breit* court emphasized that the "willful disregard" standard contemplates situations where

the prosecutor is actually aware, or is presumed to be aware, of the potential consequences of his or her actions. The term connotes a conscious and purposeful deci-

sion by the prosecutor to dismiss any concern that his or her conduct may lead to a mistrial or reversal.

*Id.* (citation omitted). The *Breit* court further noted:

Though we indicate the official must know, *or under certain circumstances is presumed to know,* that the conduct is improper, we doubt a claim of lack of experience could lift the bar of double jeopardy. Rare are the instances of misconduct that are not violations of rules that every legal professional, no matter how inexperienced, is charged with knowing.

*Id.* (emphasis added) (citing *Pool,* 677 P.2d at 270). Therefore, a growing number of state courts have recognized that the specific intent standard adopted by the United States Supreme Court in *Kennedy* fails adequately to protect defendants' right to a fair trial against prosecutorial misconduct and have adopted objective standards focusing on the prejudice to defendants' right to a fair trial.

### 3. *The Inadequacy of the Specific Intent Standard*

▮ We agree with the reasoning and analysis of the New Mexico Supreme Court in *Breit* and the Texas Court of Criminal Appeals in *Bauder II.* In our view, the specific intent standard does not adequately afford criminal defendants protection from prosecutorial misconduct. Indeed, "to be meaningful, the protection against double jeopardy must be analyzed with an objective standard." *Bauder I,* 880 S.W.2d at 504–05 (Butts, J., dissenting).[8]

As Justice Stevens aptly observed in *Kennedy,*

8. As the dissent in *Bauder I* noted:
 The obvious difficulty with the Kennedy standard is that it requires ... [a court to] "look at the prosecutor's actions under the circumstances and try to guess what he was thinking." A fundamental right should not be left dangling from such a tenuous thread.... If double jeopardy is to mean anything ..., appellate courts must be able to analyze the salient issues from the objective facts in the record.... If we cannot conclude from the objective facts in the record whether double jeopardy rights have been protected, then it is time to breathe life into the double jeopardy clause of the Texas Constitution and craft a

[i]t is almost inconceivable that a defendant could prove that the prosecutor's deliberate misconduct was motivated by an intent to provoke a mistrial instead of an intent simply to prejudice the defendant. The defendant must shoulder a strong burden to establish a bar to reprosecution when he has consented to the mistrial, but the Court's subjective intent standard would eviscerate the exception [to the general rule that a retrial after reversal on appeal is not barred by double jeopardy].

*Kennedy,* 456 U.S. at 688, 102 S.Ct. 2083 (Stevens, J., concurring).[9] Indeed, a defendant will seldom be able to prove that the prosecutor had the specific intent to goad him or her into moving for a mistrial with the purpose of obtaining a better chance of obtaining a conviction. In our opinion, determining the prosecutor's subjective intent inherently requires a guess, not appropriate for purposes of determining a defendant's double jeopardy interests.

Moreover, the prosecutor's subjective intent is irrelevant for purposes of determining a defendant's constitutional double jeopardy rights. As one commentator has stated,

regardless of the prosecutorial motive, the defendant suffers severe deprivation of his rights. Constitutional rights are to be protected irrespective of the motive or intent of the actor whose conduct has occasioned an infringement of them[.]

James F. Ponsoldt, *When Guilt Should Be Irrelevant: Government Overreaching as a Bar to Reprosecution Under the Double Jeopardy Clause After Oregon v. Kennedy,* 69 Cornell L.Rev. 76, 98 (1983) (quoting Comment, *Double Jeopardy and Reprosecution After Mistrial: Is the Manifest Necessi-*

standard more "free from practical difficulty" that will protect our citizens from governmental overreaching.
 *Bauder I,* 880 S.W.2d at 506 (Butts, J., dissenting) (internal citations omitted).

9. As one commentator noted: "In the sixteen years since *Kennedy* was decided, there appear to be only two reported instances in which the *Kennedy* intent criterion has afforded a remedy for even the most egregious misconduct." *Rosenthal, supra* at 910 (citing *Beck v. State,* 261 Ga. 826, 412 S.E.2d 530 (1992), and *State v. Laster,* 223 Mont. 152, 724 P.2d 721 (1986)).

*ty Test Manifestly Necessary?*, 69 Nw. U.L.Rev. 887, 888 (1975)). The *Kennedy* test therefore misdirects the focus of the double jeopardy protections on the harboring of bad intentions as opposed to the prevention of unacceptable behavior by the prosecution.

Finally, we are mindful of the fact that when egregious prosecutorial misconduct results in a reprosecution either by mistrial or a reversal on appeal, the burden of another trial cannot be attributed to defendant's preference to start anew rather than to complete the trial before the original tribunal. On the contrary, the burden of retrial in such a case is attributable to the prosecution's misconduct or overreaching, though perhaps not specific intent, designed to force the defendant to such a choice. *See Green v. United States*, 451 U.S. 929, 931 n. 2, 101 S.Ct. 2005, 68 L.Ed.2d 316 (1981) (Marshall, J., dissenting from denial of certiorari) (questioning "the validity of the lower court's assumption that the Government in such cases tailors its misconduct to achieve one improper result as opposed to another ... [but that] [i]t is far more likely that ... where the prosecution is concerned that the trial may result in an acquittal, that the Government engages in misconduct with the general purpose of prejudicing the defendant"); *see also State v. Kennedy*, 666 P.2d at 1326. In such a case, the prosecution has intentionally exposed the defendant to multiple trials for the same crime and has subverted his or her right to complete the proceeding before the original tribunal. It is therefore the very type of situation the double jeopardy provision sought to prevent.

Given the inadequacy of the specific intent standard adopted by the United States Supreme Court in *Kennedy*, we take this opportunity, "as the ultimate judicial tribunal with final unreviewable authority to interpret and enforce the Hawai'i Constitution," to "give broader protection under the Hawai'i Constitution than that given by the federal constitution." *See, e.g., State v. Hoey*, 77 Hawai'i 17, 36, 881 P.2d 504, 523 (1994) (citation omitted) (declining to follow *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)); *State v. Wallace*, 80 Hawai'i 382, 414 n. 30, 910 P.2d 695, 727 n. 30 (1996). Accordingly, we hold, under the double jeopardy clause of article I, section 10 of the Hawai'i Constitution, that reprosecution of a defendant after a mistrial or reversal on appeal as a result of prosecutorial misconduct is barred where the prosecutorial misconduct is so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a fair trial.[10] In other words, we hold that reprosecution is barred where, in the face of egregious prosecutorial misconduct, it cannot be said beyond a reasonable doubt that the defendant received a fair trial.[11]

Our holding is consistent with our previous interpretations of the double jeopardy clause of the Hawai'i Constitution. We have often interpreted our double jeopardy clause to provide broader protections than the double jeopardy clause of the fifth amendment to the United States Constitution where the federal interpretation did not adequately preserve the rights and interests sought to be protected. *See State v. Jumila*, 87 Hawai'i 1, 12, 950 P.2d 1201, 1212 (1998) (Ramil, J.,

---

10. We note that this standard is, in effect, the logical extension of our previous holdings in *Baranco*, 77 Hawai'i at 355, 884 P.2d at 733, and *Pulawa*, 58 Haw. at 382, 569 P.2d at 905. To the extent that our decisions in *State v. Hamala*, 73 Haw. 289, 834 P.2d 275 (1992), and *State v. Hoke*, 69 Haw. 44, 731 P.2d 1261 (1987), and the decision of the Intermediate Court of Appeals in *State v. Dowsett*, 10 Haw.App. 491, 878 P.2d 739 (1994), are inconsistent with today's holding, they are overruled.

11. We note and emphasize that the standard adopted for purposes of determining whether double jeopardy principles bar a retrial caused by prosecutorial misconduct requires a much higher standard than that used to determine whether a defendant is entitled to a new trial as a result of prosecutorial misconduct. Double jeopardy principles will bar reprosecution that is caused by prosecutorial misconduct only where there is a highly prejudicial error affecting a defendant's right to a fair trial and will be applied only in exceptional circumstances such as the instant case. By contrast, prosecutorial misconduct will entitle the defendant to a *new trial* where there is a reasonable possibility that the error complained of might have contributed to the conviction" (*i.e.*, the error was not "harmless beyond a reasonable doubt"). *See, e.g., Sawyer*, 88 Hawai'i at 329 n. 6, 966 P.2d at 641 n. 6 (citations omitted).

dissenting); *see also, e.g., Lessary,* 75 Haw. 446, 865 P.2d 150 (adopting the "same conduct" test and rejecting the current federal standard based on the "same elements" test); *Wallace,* 80 Hawai'i at 414 n. 30, 910 P.2d at 727 n. 30 (holding that double jeopardy clause of state constitution precludes retrial of defendant whose conviction has been set aside because of insufficient evidence and that sufficiency of the evidence is reviewed based only on the evidence that was properly admitted at trial); *Quitog,* 85 Hawai'i at 149, 938 P.2d at 580 (holding that retrial barred under state constitution when government's deliberate trial strategy accompanies the termination of the first trial without the jury passing upon that charge); *contra, e.g., Tuipuapua,* 83 Hawai'i at 151, 925 P.2d at 321 (adopting the federal standard applied in *United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), regarding administrative forfeitures). Because we have determined, for the reasons discussed above, that the specific intent standard adopted by the United States Supreme Court in *Kennedy* is inadequate to protect the rights and interests of the defendant sought to be protected, we have taken this opportunity to balance the interests of society and the criminal defendant.

### 4. *Rogan's Double Jeopardy Interests*

 Turning to the facts of the instant case, we note the egregiousness of the deputy prosecutor's misconduct. As discussed above, the deputy prosecutor's remarks that it was "every mother's nightmare" to find "some black, military guy on top of your daughter" was an appeal to racial prejudice that had no objectively legitimate purpose. Given that such a comment would likely arouse a jury's possible predisposition against some particular segment of society so as to stigmatize Rogan, the deputy prosecutor's comment constituted a particularly egregious form of prosecutorial misconduct. Inasmuch as "[r]acial fairness of the trial is an indispensable ingredient of due process and racial equality a hallmark of justice[,]" *Doe,* 903 F.2d at 24–25, we can only conclude that the egregiousness of the deputy prosecutor's remark rose to such a level that we cannot determine beyond a reasonable doubt that Rogan received a fair trial. Indeed, the prosecution is charged with knowing that arguments that rely on racial, religious, ethnic, political, economic, or other prejudices of the jurors introduce into the trial elements of irrelevance, irrationality, and unfairness that cannot be tolerated.[12] Under these circumstances, we hold that the deputy prosecutor's remark was so egregious, from an objective standpoint, that the inference is inescapable that the remark clearly denied Rogan his right to a fair trial. Accordingly, reprosecution of Rogan is barred by the double jeopardy clause of article I, section 10 of the Hawai'i Constitution.

### IV. CONCLUSION

 For the reasons discussed above, we reverse the circuit court's judgment, guilty conviction and sentence, and notice of entry filed on August 26, 1998.[13]

---

12. As one court noted:

"The factor of racial prejudice has been formally and officially squelched in our society after long and arduous struggles. Where it remains informally, it cannot be condoned. Certainly, then, its use cannot be invoked by counsel in a court of law, without running counter to the Sixth and Fourteenth Amendments' guarantees."

*Kornegay v. State,* 174 Ga.App. 279, 329 S.E.2d 601, 605 (1985).

13. In his second point of error, Rogan contends that HRS ch. 846E violates various protections afforded by the United States and Hawai'i Constitutions as applied to him. However, because we hold that reprosecution is barred by the double jeopardy clause of the Hawai'i Constitution, Rogan's contention that HRS ch. 846E, which imposes certain registration and public disclosure requirements on sex offenders (*i.e.,* "Megan's Law"), appears to be moot. Indeed,

the mootness doctrine encompasses the circumstances that destroy the justiciability of a case previously suitable for determination. A case is moot where the question to be determined is abstract and does not rest on existing facts or rights. Thus, the mootness doctrine is

properly invoked where events have so affected relations between the parties that the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised.
*State v. Fukusaku*, 85 Hawai'i 462, 474–75, 946 P.2d 32, 44–45 (1997) (quoting *AIG Hawaii Ins. Co., Inc. v. Bateman*, 82 Hawai'i 453, 458–59, 923 P.2d 395, 400–01 (1996) (quoting *In re Appli-*

*cation of J.T. Thomas*, 73 Haw. 223, 225–26, 832 P.2d 253, 254 (1992))). Inasmuch as Rogan's conviction has been reversed and reprosecution has been barred, Rogan is no longer subject to HRS ch. 846E. In other words, any existing controversy involving Rogan has been extinguished. Therefore, we need not address Rogan's second point of error.