**Electronically Filed
Supreme Court
SCWC-12-0000537
30-JUN-2020
06:09 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o--

_____

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

SEAN CONROY,
Petitioner/Defendant-Appellant.

_____

SCWC-12-0000537

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000537; CR. NO. 11-1-0355(4))

JUNE 30, 2020

McKENNA, POLLACK, AND WILSON, JJ., WITH RECKTENWALD, C.J.,
DISSENTING, WITH WHOM NAKAYAMA, J., JOINS

OPINION OF THE COURT BY WILSON, J.

Petitioner/Defendant-Appellant Sean Conroy ("Conroy") was convicted following a jury trial of assault in the second degree. The prosecutor made at least eight improper statements during closing argument in violation of Conroy's right to a fair trial. The misconduct affected the issue central to Conroy's self-defense claim: whether he acted with the intent to protect

himself.  The only witnesses to the incident at the time of the injury were Conroy and his wife (hereinafter CW).  Therefore, in the circumstances of this case, the violation of Conroy's due process right to a fair trial was not harmless beyond a reasonable doubt.

## I. Factual Background

### A.  Circuit Court Proceedings

Conroy was indicted for assault in the first degree in violation of HRS § 707-710(1) (1993), in connection with an incident involving CW.[1]  At trial, CW testified that she was married to Conroy on the date of the incident and that they were living together in an apartment in Kīhei, Maui.[2]  According to CW, on March 14, 2011, she and Conroy had an argument in their apartment parking lot; they were struggling over her Camaro car keys when Conroy punched her in the face with both of his fists, and CW lost consciousness.  CW testified that she could not recall the number of times she was struck because she lost consciousness.  CW also testified that she did not recall hitting Conroy prior to Conroy's first punch, and that she did not kick Conroy prior to being punched.  CW further stated that

---

[1]     HRS § 707-710(1) (1993) provides:  "A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person."

[2]     The Honorable Richard T. Bissen, Jr. presided.

2

on the day of the incident she was 5'9" and weighed 120 pounds, and that Conroy was 6'4" or 6'5" and weighed 240 or 250 pounds.

When CW was asked if she told a police officer that she slapped Conroy once on his left temple, CW stated, "I guess. I guess that's what I told him." The State entered into evidence a photo of CW six months before the incident, and a photo of CW taken in April 2011 after the incident. CW testified that the two photos demonstrated that her smile was different as a result of the incident, and that she can "only smile with half [of her] face [because of] the injuries." CW also stated that she has had nightmares about the incident, which have clouded "[her] memories of the exact things that happened on [the day of the incident]."

Dr. Andrew Don ("Dr. Don"), who supervised CW's follow-up treatment, testified that eight days after the incident, CW's left cheek and nose were swollen, her eyes were swollen and possibly bloodshot, and that she had a "chip fractured on the front of her teeth." He further testified that CW's nose was fractured on both sides, and that her cheekbone was also fractured and bruised on the left side. Dr. Don also testified that because of CW's swelling, a large blood clot was coagulating on that side of her face, causing scarring and restricting the movement of her face. According to Dr. Don, CW's condition could be permanent, and surgery would not make

3

any difference. He also stated that CW's injuries were caused by at least two "full-force [blows] from the fist."

Officer William Melton ("Officer Melton"), who responded to the incident, testified that CW appeared to be dazed, and had a swollen face, swollen eyes, some blood to the left side of her eye, and some cuts on her body. Officer Melton stated that Conroy waived his right to remain silent, and recounted Conroy's statement as follows:

> Basically, [Conroy] stated that he suspected his girlfriend, [CW], was fooling around. [Conroy] saw some things in the car that she wanted to drive off in. And further, [Conroy] believed that [CW] was going to be with another man, and they fought over a set of keys to the Camaro that [CW] wanted to use. [Conroy] got struck to the left side of his temple he said, and then he responded by punching [CW] twice to the face.

Officer Melton also testified that Conroy told him that when he punched CW twice in the face, she was knocked backwards onto the hood of the Camaro. Officer Melton stated that Conroy indicated that he had injuries to the left side of his temple where he had been struck, and that there was a "red linear marking, kind of purplish on the left side of [Conroy's] temple." According to Officer Melton, Conroy did not complain of any other injuries, such as being kicked in the groin. Officer Melton further testified that if Conroy told him that he had been kicked in the groin, then he would have indicated it in his report because "[a]nytime a guy gets kicked in the groin, that's an attention grabber."

4

Jon Brammer ("Brammer"), CW's and Conroy's neighbor, testified that immediately after the incident, CW looked like she "had hit her head on the steering wheel" in an auto accident. Brammer testified that at that time, CW was arguing and swearing at Conroy, and Conroy was verbally defending himself. Brammer testified that CW said, "You hit me," and Conroy replied, "Well, you hit me." Brammer also testified that Conroy stated that "[CW] asked for it[,]" and that he heard Conroy say to CW, "[Y]ou know you had it coming," and "[D]on't tell me you didn't deserve it." The State then rested its case.

The defense then presented its case, and recalled Brammer, who testified about a 2010 incident that occurred at his home, where CW was allegedly drunk and lying down on the floor. According to Brammer, CW did not want to be moved, and when Conroy attempted to pick CW up, she "thrashed out" and kicked Conroy's hand twice.

Conroy testified on his own behalf at trial. At the beginning of Conroy's testimony, he was asked about a previous incident in 2009 involving an argument with CW. He testified that CW hit him on the side of his head at least three times with a television remote control, knocking out his tooth.

Conroy testified that on the day of the incident, the nature of his relationship with CW was "more of a roommate

5

situation," and that CW "did her own thing and was in her own room, [and] chose not to do anything with [him] in any sense."

CW asked him to move his truck and when he approached his truck, he saw his personal items in the back seat of the Camaro. Conroy thought that CW "was trying to rub something in [his] face, that she could do what she liked with whatever." He began to take his personal items from the Camaro and put them on the hood of his truck and in the empty adjacent parking stall. In response, CW retrieved the items and put them back into the Camaro. CW then yelled at him, accusing him of acting childish. In response, Conroy told CW, "I'm done being disrespected. . . . I'm done. . . . I just -- I want you to leave. I want you to leave. Just please give me the keys."

He asked CW to give him the keys to the truck, house, mailbox, and Camaro because he owned them all.[3] CW swore at him, and taunted him by asking, "These keys?" and "yanked" the keys back when he attempted to take them. He asked CW to give him the keys several more times, and CW then kicked him in the groin, causing him to bend over. Immediately after he was kicked, CW hit him on his head on the left side of his temple. He then punched CW twice in the face, causing her to fall back on the Camaro. When he tried to help CW onto her feet, she was

_____

[3] CW had testified that the Camaro was jointly owned by Conroy and herself.

dazed and fell to the ground, and he testified that he was "scared," "shaken," and thought, "oh my God, I've got to get help."

When Officer Melton arrived at the scene, Conroy started to explain that CW was his wife, and then explained that he guessed that CW was "more of a friend now." He informed Officer Melton that he had injuries to his head and groin. On cross-examination, Conroy also testified that he re-broke the metacarpal bone of his little finger when he punched CW.

On rebuttal, CW testified that approximately a year before the incident in the instant case, Conroy accused her of having a "man's name in [her] contact list" in her phone, and an argument ensued. According to CW, Conroy punched her in the side of the face or head with a fist, and "grabbed [her] by the throat and neck and began to squeeze," making it difficult for CW to breathe.

In the State's closing argument, the prosecutor sought to persuade the jury that Conroy's intent was not to defend himself but to manifest his anger and jealousy by making "<u>sure that she didn't give that smile to any other man</u>[.]" The prosecutor's argument was objected to by Conroy's counsel three times, however the court sustained only one objection and did

not strike the improper comment, allowing the two other

statements over the defense's objections:[4]

> [PROSECUTOR:] <u>Their marriage was going down.
> [CW] no longer gave the Defendant nature's smile, so
> he was going to make sure that she didn't give that
> smile to any other man, and she won't.  She can't.</u>
> <u>He was going to teach her a lesson, a lesson
> that she would never, could never forget, a lesson
> she would remember every time she looked in a mirror.
> Look at [CW's] eyes.  What do you see in those eyes?
> Resignation, defeat, a woman that's learned her
> lesson.  We should teach her a new lesson.  I say we
> teach her that there is justice in the world.  I say
> we teach her that there can be justice in this --</u>
>
> [DEFENSE COUNSEL]:  Your Honor, I would just object.
> Passion, prejudice.
>
> THE COURT:  Sustained, counsel.
>
> . . . .
>
> [PROSECUTOR]:  <u>Whatever we do here, we're not going
> to put nature's smile back on [CW's] face, but you
> can put the smile back in her eyes.  What is justice
> in this case?  It's finding the Defendant guilty of
> the crime that he committed.</u>  Holding him accountable
> for the full extent of what he did.  As a community,
> you come together to formally agree on what he did to
> make a judgment on his actions.  The actions he took
> on March 14, 2011 and what he did on March 14, 2011
> was assault in the first degree.
>
> . . . .
>
> So, therefore, what I began in this -- at this
> portion, what is justice?  Justice is going to be
> returning a verdict where that box is checked where
> as to assault in the first degree, you'll find him
> guilty as charged.
>
> <u>Consider that, you know, when Defendant broke
> [CW's] face, when you look at the way she testified,
> consider her demeanor, the pictures of her after the
> scene.  He broke something inside of her as well.</u>
>
> [DEFENSE COUNSEL]:  Your Honor, objection.  Passion,
> prejudice.

---

[4]     The prosecutor's statements that are at issue on appeal are underlined.

THE COURT:  I'll allow this.

[PROSECUTOR]:  <u>We all want [CW's] spirit to heal even if her face won't.  But in order for that to happen, there has to be justice done.</u>

[DEFENSE COUNSEL]:  Your Honor, same objection.

THE COURT:  So noted, Counsel.

[PROSECUTOR]:  Give [CW] the justice that she needs.  Give her the justice she deserves.  Most importantly, give the Defendant the justice that he deserves.  Find him guilty of assault in the first degree.  Now, there's going to be -- I would leave with you I think we should be curious about whether the Defendant can explain two things.
     One, how does a man who has been kicked directly on his right testicle bent over in excruciating pain deliver two power punches strong enough to break [CW's] left cheek, shatter her nose and send her 120-pound body flying onto the hood of the Camaro?  Explain that.  Explain also why there were no tears on the Defendant's face when he was testifying.

In Conroy's closing argument, defense counsel argued that CW kicked Conroy in the groin, and then as he bent over, CW punched him in his temple.  In response to CW's kick, Conroy threw two unaimed punches that were not planned, or conducted in retaliation, and were instead for self-defense and to get away from CW.  When Conroy realized where he had hit CW, he was scared and tried to help her.  Defense counsel told the jury that CW was not a credible witness, and that Conroy, even though "he had no duty to testify," told the truth and was credible.

In the State's rebuttal argument, the prosecutor again asked the jury to find that Conroy's intent was to hurt CW, not to defend himself.  Defense counsel objected three times; the

court sustained two objections and instructed the jury to disregard the improper statements twice:

> [PROSECUTOR]: You break my heart, I break your face. That's what this case is about.
>
> [DEFENSE COUNSEL]: Your Honor, I would just object. Passion and prejudice.
>
> THE COURT: All right. Sustained.
>
> [DEFENSE COUNSEL]: Move to strike.
>
> THE COURT: So ordered. The jury will disregard. The Court will order that last statement struck.
>
> . . . .
>
> Now, as far as the defense counsel's statement that Defendant's testimony was the more credible one, why then were there no tears on his face? When he was feigning his emotion about, you know, this situation and trying to get his keys and frustration and then feeling sorry for her after he had hit her. And he's making this crying face. Why were there no tears? That has not been explained.
>
> The statement itself, you'll behold as far as credibility, you can consider the probability or improbability of a person's statement. You know, when -- in direct examination of the Defendant, defense counsel tried to say in asking him, okay, you were kicked on the right side or it was off to the side, but in cross-examination, he made it pretty clear, that, no, it was a hit to my right testicle. If it was a kick to his right testicle and he was bent over in excruciating pain, he would not have been able to hit anybody.
>
> I think that's part of, certainly for the guys here --
>
> [DEFENSE COUNSEL]: Your Honor, I would just object, improper opinion.
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: Move to strike.
>
> THE COURT: Stricken. The jury will disregard the last remark made by the attorney.

The jury found Conroy guilty of assault in the second degree under HRS § 707-711 (Supp. 2010),[5] which was the lesser included offense of assault in the first degree for which Conroy was indicted. On May 2, 2012, the circuit court entered its Judgment of Conviction and Probation Sentence, sentencing Conroy to sixty days of imprisonment and five years of probation, with credit for time served. The court stayed the jail sentence pending appeal.

**B. ICA Proceedings**

Conroy appealed to the ICA, arguing that many of the statements the prosecutor made during closing argument and rebuttal closing argument constituted misconduct. Conroy broadly contended that the prosecutor's statements contained a "stream of characterizations offered to raise and inflame the passions of the jury," which were not based on evidence adduced at trial, and that the prosecutor repeatedly used "I" to insert personal opinion, misstated evidence, and that the error was not harmless. Accordingly, Conroy argued that his conviction should

---

[5]     HRS § 707-711(1)(a)-(b) (Supp. 2010) provides in pertinent part:

(1) A person commits the offense of assault in the second degree if:

(a) The person intentionally, knowingly, or recklessly causes substantial bodily injury to another; [or]

(b) The person recklessly causes . . . substantial bodily injury to another[.]

be reversed, or in the alternative, vacated and remanded for a new trial.

The State argued that the prosecutor's statements did not constitute misconduct because they properly urged the jury to hold Conroy responsible for his actions and were reasonable inferences drawn from the evidence. The State further argued that even assuming the alleged improper statements constituted misconduct, they were harmless.

In a summary disposition order, the ICA determined that only one of the prosecutor's statements constituted misconduct: "You break my heart, I break your face. That's what this case is about." State v. Conroy, No. CAAP-12-0000537, 2016 WL 3524605, at *15 (App. June 27, 2016)(SDO). However, the ICA concluded that any related error was harmless. Id. Thus, the ICA affirmed the circuit court's Judgment of Conviction and Probation Sentence. Id. The ICA filed its Judgment on Appeal on July 22, 2016.

## II. Standard of Review

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999)

12

(internal quotation marks and citations omitted)(quoting State v. Sawyer, 88 Hawai'i 325, 329 n.6, 966 P.2d 637, 641 f.6 (1998)).

"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. McGriff, 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the appellate court considers] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." State v. Agrabante, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992).

### III. Discussion

### A. At Least Eight of the Prosecutor's Statements During Closing Argument and Rebuttal Were Improper.

"The term 'prosecutorial misconduct' is a legal term of art that refers to any improper action committed by a prosecutor, however harmless or unintentional." State v. Udo, 145 Hawai'i 519, 534, 454 P.3d 460, 475 (2019). Allegations of prosecutorial misconduct are first reviewed to determine whether the prosecutor's actions were improper, and violated the accused

13

citizen's right to a fair trial.[6]  If so, the court must then determine whether the violation of the right to a fair trial was harmless.  <u>State v. Tuua</u>, 125 Hawai'i 10, 14, 250 P.3d 273, 277 (2011).

Having reviewed the proceedings of the trial afforded Defendant Conroy, it is apparent the prosecutor committed misconduct at least eight times in violation of Conroy's right to a fair trial — specifically during closing argument.[7]

First, the prosecutor asserted that Conroy "<u>was going to make sure that [CW] didn't give that smile to any other man, and she won't.  She can't.</u>"

Second, the prosecutor told the jury "<u>we should teach her a new lesson.  I say we teach her that there is justice in the world.  I say we teach her that there can be justice in this. . . .</u>"

Third, the prosecutor told the jury they were to find Conroy guilty to "<u>put the smile back in her eyes.</u>"

Fourth, the prosecutor asked the jury to consider that Conroy "<u>broke something inside of [CW.]</u>"

---

[6]  <u>See</u> <u>State v. McGhee</u>, 140 Hawai'i 113, 123 f.10, 398 P.3d 702, 712 n.10 (2017) ("The district court in this case plainly erred when it allowed the prosecutor to read in closing argument Kearney's 252 Statement, which was not in evidence.  This error affected McGhee's substantial rights because it severely compromised McGhee's right to a <u>fair trial</u>.").

[7]  The Dissent agrees that all eight statements were improper. Dissent at 2.

14

Fifth, the prosecutor noted the jury's purpose was to heal CW's spirit: "We all want [CW's] spirit to heal even if her face won't. But in order for that to happen, there has to be justice done."

Sixth, the prosecutor repeated his admonition to the jury — previously ruled improper by the trial court - that its purpose was to provide justice to CW in order to heal her: "We all want [CW's] spirit to heal even if her face won't. But in order for that to happen, there has to be justice done."

Seventh, the prosecutor asserted that "You break my heart, I break your face. That's what this case is about."

And eighth, the prosecutor injected personal knowledge about the pain caused by a kick to the groin.

## 1.  FIRST STATEMENT

The statement that Conroy "was going to make sure that [CW] didn't give that smile to any other man, and she won't. She can't[,]" improperly encouraged jurors to sympathize with CW, and to consider the effects of CW's injuries on her future relationships and quality of life. Rogan, 91 Hawai'i at 414, 984 P.2d at 1240 ("the statement that the incident was 'every mother's nightmare,' . . . was a blatantly improper plea to evoke sympathy for the Complainant's mother and represented an

15

implied invitation to the jury to put themselves in her position").[8]

## 2. SECOND STATEMENT

The prosecutor next improperly informed the jury that its purpose was to provide justice to CW:

> [Conroy] was going to teach [CW] a lesson, a lesson that she would never, could never forget, a lesson she would remember every time she looked in a mirror. Look at [CW's] eyes. What do you see in those eyes? Resignation, defeat, a woman that's learned her lesson. We should teach her a new lesson. <u>I say we teach her that there is justice in the world</u>. I say we teach her that there can be justice in this--.

(Emphasis added).

The trial court sustained Conroy's objection on the grounds that it inflamed the passions and prejudice of the jury, that it was not based on evidence, and that the prosecutor improperly inserted personal opinion by using the terms, "I" and "we."

The prosecutor's statement was clearly improper. In State v. Apilando, this court held that it was improper for the prosecutor to request that the jury "send a message to the community that [the defendant's] actions were wrong and would not be tolerated." 79 Hawai'i 128, 141-43, 900 P.2d 135, 148-50 (1995). This court reasoned that as a result of this "send a

---

[8] The Dissent parses <u>Rogan</u> to diminish the importance of prosecutorial misconduct deemed "blatantly improper" by this court in <u>Rogan</u>: namely, an appeal to the sympathy of the jury to place themselves in the position of the mother of the complaining witness who alleged sexual assault. Dissent at 5.

message" statement, "there [was] a significant risk that the jury might find the defendant guilty simply based on its view that the conduct the defendant [was] accused of committing [was] intolerable, even though it ha[d] not been proved beyond a reasonable doubt."  Id. at 142-43, 900 P.2d 149-50.

Here, the statement encouraged the jury to teach CW that justice exists, which could have "divert[ed] the jury from its duty to decide the case on the evidence."  Id. at 149, 900 P.2d at 142 (citations and internal quotation marks omitted); see State v. Mars, 116 Hawai'i 125, 143, 170 P.3d 861, 879 (App. 2007)(finding that the prosecutor's comment that "[t]his community is measured by how we treat its weakest members" was improper because it "appeared to invite the jury to base its verdict on considerations other than the evidence in the case"); United States v. Weatherspoon, 410 F.3d 1142, 1149 (9th Cir. 2005)("A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking.  The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence.") (quoting United States v. Koon, 34 F.3d 1416, 1443 (9th Cir. 1994)).

The prosecutor also improperly sought to add the imprimatur of his office by asking the jury to join him to teach CW a lesson and provide justice to CW:  "We should teach [CW] a new lesson.  I say we teach [CW] that there is justice in the world. . . .  Whatever we do here, we're not going to put nature's smile back on [CW's] face."  (Emphasis added).  The prosecutor's use of the inclusive pronoun, "we," implied that the jury and the State had similar interests and were working together in convicting Conroy to provide CW justice.  This implication of unity, and the suggestion of an alliance between the State and the jury against Conroy, was improper:

> In light of the "prestige associated with the prosecutor's office" and the "significant persuasive force" the prosecutor's argument is likely to have on the jury, this court has repeatedly recognized that the prosecutor "has a duty to seek justice, to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused."

State v. Basham, 132 Hawai'i 97, 116, 319 P.3d 1105, 1124 (2014).

### 3. THIRD STATEMENT

The prosecutor then continued his improper request to the jury by advising them to find Conroy guilty in order to put a smile in CW's eyes:  "Whatever we do here, we're not going to put nature's smile back on [CW]'s face, but you can put the smile back in her eyes.  What is justice in this case?  It's finding the Defendant guilty of the crime that he committed."  The implication to the jury was that a just verdict is one of

18

guilt that would allow CW to smile again. Again the jury was diverted from their duty to decide the case based on the evidence in order to consider a verdict that would make the CW smile. See e.g., State v. Klinge, 92 Hawai'i 577, 592, 994 P.2d 509, 524 (2000)("the prosecutor's remark could have 'divert[ed] the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law.'").

### 4. FOURTH STATEMENT

The improper appeal to the jury to make a decision to demonstrate to CW sympathy for her injuries was compounded by subsequent statements from the prosecutor: "Consider that, you know, when [Conroy] broke [CW's] face, when you look at the way she testified, consider her demeanor, pictures of her after the scene. [Conroy] broke something inside of her as well." Conroy objected to these statements on the basis of "passion, prejudice". The court overruled the objection, stating, "I'll allow this."

The prosecutor's statements improperly appealed to the passions of the jury, encouraging jurors to make a decision based on their sympathies towards CW and to consider any emotional injuries that she suffered. Rogan, 91 Hawai'i at 414, 984 P.2d at 1240.

19

### 5. FIFTH AND SIXTH STATEMENTS

Next, the prosecutor again improperly sought to persuade the jury to make a decision based on their sympathy for injuries CW suffered and the duty to help her heal: "We all want [CW's] spirit to heal even if her face won't. But in order for that to happen, there has to be justice done." Conroy objected to this statement as an appeal to passion and prejudice. The court responded, "So noted, Counsel."

We conclude the statement was improper because, viewed in context, it was calculated to "divert the jury from its duty to decide this case based on the evidence[.]" Apilando, 79 Hawai'i at 149, 900 P.2d at 142. The prosecutor requested that the jurors provide justice to help heal CW's spirit, which could have encouraged them to make their decision based on sympathy for CW or a need to exact retribution on Conroy rather than on the evidence.

### 6. SEVENTH STATEMENT

After defense counsel's closing argument, the prosecutor began his rebuttal closing argument by stating: "You break my heart, I break your face. That's what this case is about." Conroy objected to this statement on the basis of

passion and prejudice, and the court sustained the objection, struck the statement, and instructed the jury to disregard it.[9]

We agree with the ICA that this statement improperly referred to facts not in evidence. Conroy, 2016 WL 3524605, at *8.

### 7. EIGHTH STATEMENT

Thereafter, the prosecutor sought to provide additional evidence to the jury based on his personal experience that if Conroy were kicked in the testicle, he would not have been able to strike CW:

> The statement itself, you'll behold as far as credibility, you can consider the probability or improbability of a person's statement. . . . If it was a kick to [Conroy's] right testicle and he was bent over in excruciating pain, he would not have been able to hit anybody. I think that's part of, certainly for the guys here --

Conroy objected to this statement on the basis of improper opinion, and the court sustained the objection, struck the statement, and instructed the jury to disregard it.

The statement was improper. The prosecutor was beginning to comment on his personal knowledge of the amount of pain a kick to the groin would have caused when he stated, "I think that's part of, certainly for the guys here --[.]" While

---

[9] The ICA recognized that this statement constituted prosecutorial misconduct when it found no evidentiary support for the statement by the prosecutor: "You break my heart, I break your face. That's what this case is about." Conroy, 2016 WL 3524605, at *8.

comments based on the testimony regarding the alleged kick to Conroy's groin would have been proper, the prosecutor's comment regarding his personal knowledge of the severity of pain a man experiences when kicked in the groin was improper. Tuua, 125 Hawai'i at 12, 250 P.3d at 275 (holding that the prosecutor engaged in misconduct by stating to the jury during closing arguments, without supporting evidence, that the defendant's brother could be convicted of perjury for testifying that he, rather than his brother Tuua, committed the offense.); cf. State v. Nofoa, 135 Hawai'i 220, 227-30, 349 P.3d 327, 334-37 (2015) (holding that it was error for the court to instruct the prosecutor that evidence could be offered to the jury during the state's rebuttal argument).

B.  **Prosecutorial Misconduct Affecting the Issue of Defendant's Intent Was Not Harmless Beyond a Reasonable Doubt Where the Only Witnesses to the Altercation Were the Defendant and the CW.**

As noted, a three-part test is applied to determine whether prosecutorial misconduct is harmless. "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the appellate court considers] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." Agrabante 73 Haw. at 198, 830 P.2d at 502. The standard the prosecution must meet to prove the

violation of an accused's constitutional right to a fair trial was harmless is whether "there is a reasonable possibility that error might have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside." State v. Holbron, 80 Hawai'i 27, 32, 904 P.2d 912, 917 (1995).

The nature of the misconduct committed by the prosecutor was one of repeated improper appeal to the jury to find Conroy guilty based on sympathy for CW and the need to heal her — and to improperly call for the jury to deliver justice not based on the facts, but on the need to provide revenge in the form of a guilty verdict. Eight times improper statements were made to the jury. In particular, the prosecutor continued to improperly explain to the jury that they should provide justice to CW after the court had previously sustained the objection to those same arguments.

The nature of the misconduct included a statement to the jury that lacked any evidentiary support. The prosecutor ascribed to the Defendant the statement "You break my heart, I break your face." As the Intermediate Court acknowledged, there was no evidence to support the prosecutor's claim that Conroy

"had this thought[.]"[10]   However, the assertion constituted support for the State's theory that Conroy acted out of jealousy to injure CW — rather than to defend himself.[11]

At the close of trial, the court provided the jury with a one sentence instruction to disregard stricken statements:  "Instruction number 4, you must disregard entirely any matter which the Court has ordered stricken."  The trial court's curative instructions to disregard the evidence stricken by the court were insufficient to cure the risk of prejudice to Conroy because "the cumulative effect of prejudicial conduct going to the issue of guilt is so strong that it overcomes the presumption that the curative remarks of the court have rendered

---

[10]   The ICA explained:

> The nature of the statement was improper, however, because it was phrased in the first-person point of view— You break my heart, I break your face—as though Conroy either spoke those words or had this thought at some time. Yet Conroy never testified that he intended to hurt CW; he was not asked, and did not disclose, his emotions regarding the divorce or ending relationship, nor did he tell the jury anything to support an inference that his actions were premeditated (although other witnesses seemed to attribute that type of sentiment to him).  Accordingly, it might be said that "the statement[] diverted the jury from its duty to decide the instant case on the evidence" before it.

Conroy, 2016 WL 3524605, at *11 (internal citations omitted).

[11]   The Dissent appears to conflate the fact that some evidence supports a characterization that Conroy was jealous that CW was seeing another man with the improper introduction of false evidence in the closing argument in support of this theory.  Dissent at 6.  Jealousy was indeed the motive argued by the prosecutor as a basis for the jury to reject Conroy's claim of self-defense.  The ICA found that the prosecutor committed misconduct by making the false statement:  "You break my heart, I break your face"—a statement that improperly bolstered the government's theory and contradicted Conroy's assertion of self-defense.

24

the prejudicial remarks harmless." [12]   State v. Pemberton, 71 Haw. 466, 476, 796 P.2d 80, 85 (1990)(holding that the cumulative effect of prejudicial prosecutorial misconduct was so pervasive that it overcame the presumption that limiting instructions by the trial court could render the prejudicial remarks harmless); see also Klinge, 92 Hawai'i at 596, 994 P.2d at 528 ("We recognize that there are situations in which[] although no single prosecutorial act deprive[s] Defendant of a fair trial, the cumulative effect of the prosecutor's improper conduct [can be] so prejudicial as to deny him [or her] a fair trial.").

The first two factors relevant to a determination of harmless error weigh in favor of a finding that the error was harmful:  (1) the prosecutorial misconduct was protracted, repeated, and extensive in nature; and (2) the trial court's attempts to cure the effects of the misconduct were insufficient.

Under the third factor, the strength of the evidence, an error is harmful when "there is a reasonable possibility that the error complained of might have contributed to the conviction."  State v. Pauline, 100 Hawai'i 356, 378, 60 P.3d

---

[12]   The trial court sustained four objections to the prosecutor's improper statements to the jury, but in only two instances struck the evidence and instructed the jury to "disregard the last remark by the attorney[.]"

306, 328 (2002) (citations and internal quotation omitted);

Nofoa, 135 Hawai'i at 229, 349 P.3d at 336.  Of significance to a determination of the strength of the prosecution's case is that there were no witnesses to the altercation other than Conroy and CW.[13]  The credibility of Conroy's claim that his intent was to protect himself when he hit CW was dependent on whether CW slapped him in the face and kicked him in the groin.  Their testimony was the only evidence presented as to whether CW used force against Conroy.

Conroy's testimony was that he reacted "[without] a thought"[14] to protect himself after being kicked in the groin and slapped by the CW.[15]  The force of the kick was sufficient to

---

[13]     See Rogan at 415, 984 P.2d at 1241 ("With regard to the third factor in determining prosecutorial misconduct, this case essentially turned on the credibility of two witnesses—the Complainant and Rogan.  There were no independent eyewitnesses or conclusive forensic evidence in this case. Instead, the prosecution's case against Rogan depended heavily on the Complainant's testimony.  Given that Rogan denied having committed any of the acts for which he was charged, this case was based on the Complainant's version of the events against Rogan's version.  Under these circumstances, we cannot say that the evidence of criminal conduct against Rogan was overwhelming.")(footnote omitted).

[14]     The Dissent focuses on the statement "[without] a thought" to conclude Conroy could not have acted to protect himself.  As noted, the full record provides the jury with ample evidence to support a finding that his reaction was to protect himself and that he did so in the immediacy of being struck. Dissent at 11.

[15]     The Dissent cites State v. Culkin, 97 Hawai'i 206, 216, 35 P.3d 233, 243 (2001), for the proposition that self-defense is not applicable where the Defendant is reckless in believing the use of force is necessary or in acquiring information material to justify its use.  Dissent at 12.  Culkin is instructive. The Culkin court held that under the applicable statutes self-defense is available when the defendant's subjective belief is objectively reasonable.  Id.  Thus, the court found that the defendant's

(. . . continued)

cause him to experience pain that made him bend over. While bent over, he was slapped in the face. After being slapped, he quickly threw two "unaimed" punches that caused the CW's injuries. CW's previous act of violence, as testified to by Conroy, in which the CW struck him three times in the head with a television remote with sufficient force to break his tooth, constitutes further corroboration of his self-defense claim. Conroy's testimony constituted evidence upon which a reasonable juror might have found he acted in self-defense.[16]

The strength of the evidence in support of self-defense, the protracted nature of the prosecutorial misconduct,[17]

_____

(continued . . .)

claim of self-defense was not preluded although he was charged with reckless manslaughter. Id. As in Culkin, the determination of the applicability of self-defense in this case was for the jury.

[16]    The Dissent argues that the evidence against Conroy was "so overwhelming that there is no reasonable possibility his conviction was due to the prosecutor's improper statements" because "there is no dispute that Conroy punched [CW] in the face — Conroy testified that he did so, not once, but twice." Dissent at 14, 16. While it is not disputed that Conroy punched CW in the face, Conroy's conviction turned on whether he acted in self-defense. Therefore, the proper inquiry under the third prong of the Agrabante test considers the evidence related to Conroy's self-defense claim. As discussed supra, the question of whether Conroy acted in self-defense was dependent on the jury's evaluation of the conflicting testimony of Conroy and CW. Conroy testified that he reacted without thought to protect himself after being kicked in the groin, the pain caused him to bend over and while bent over he was slapped in the face, and that he quickly threw two unaimed punches that caused the CW's injuries. The evidence presented to the jury clearly did not overwhelmingly refute self-defense, as also reflected in the court providing instruction to the jury on this defense.

[17]    The Dissent asserts that unlike three cases involving prosecutorial misconduct, Rogan, 91 Hawai'i 405, 984 P.2d 1231, Basham, 132 Hawai'i 97, 319 P.3d 1105, and Mainaaupo, 117 Hawai'i 235, 117 P.3d 1 (2008), in the instant case "the prosecutor's improper statements did not refer to

(. . . continued)

27

and the ineffective curative instructions of the court cause us to conclude that the misconduct was not harmless beyond a reasonable doubt.  See State v. Pasene, 144 Hawai'i 339, 364, 439 P.3d 864, 889 (2019) (holding that prosecutorial misconduct may provide grounds for a new trial if the prosecutor's actions denied the defendant a fair trial).

## IV.  Conclusion

The ICA's July 22, 2016 judgment on appeal and the circuit court's May 2, 2012 judgment are vacated, and the case is remanded to the circuit court for further proceedings.

| | |
|---|---|
| Matthew S. Kohm | /s/ Sabrina S. McKenna |
| for Petitioner | |
| | /s/ Richard W. Pollack |
| Richard K. Minatoya | |
| for Respondent | /s/ Michael D. Wilson |



---

(continued . . . )

the race or ethnicity of any party, express the prosecutor's personal belief that Conroy was guilty, misstate the law, or comment on the defendant's decision not to testify," and therefore the prosecutorial misconduct "did not prejudicially affect [Conroy's] substantial rights."  Dissent at 4-6.  With respect, nothing in our jurisprudence limits the situations where prosecutorial misconduct warrants a new trial to the specific circumstances listed by the Dissent.  In this case, the critical test for whether the prosecutorial misconduct is harmless is whether it can be concluded beyond a reasonable doubt that the misconduct may have contributed to the conviction.  As discussed supra, there is a reasonable possibility that the misconduct might have affected the jury's deliberations.